1

2          **E-Filed 8/25/2009**

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                            SAN JOSE DIVISION

11

| | |
|---|---|
| STEVEN R. PREMINGER, et al., | Case Number C 04-2012 JF (HRL) |
| Plaintiffs, | ORDER[1] RE PLAINTIFFS' MOTIONS FOR RELIEF FROM JUDGMENT, ATTORNEYS' FEES, AND SANCTIONS |
| v. | |
| ERIC SHINSEKI, Secretary of Veterans Affairs, et al., | [re: docket nos. 80, 134, 234, 237, 238] |
| Defendants. | |

19          Plaintiffs move for relief from judgment, attorneys' fees, and sanctions against

20  Defendants and their counsel, Owen Martikan.  The Court has considered the moving and

21  responding papers[2] and the oral argument presented at the evidentiary hearing on May 26, 2009.

22  For the reasons discussed below, Plaintiffs' motions will be denied.

23

24  _____

25          [1] This disposition is not designated for publication in the official reports.

26          [2] After completion of the briefing requested by the Court, Plaintiffs filed an additional
    post-hearing brief, along with additional evidence, on June 30, 2009.  Defendants object to this
27  late submission.  While Plaintiffs' submission is procedurally improper, the Court in the exercise
    of its discretion will consider it.  Defendants need not respond given the disposition of the
28  pending motions.

1

# I. RELIEF FROM JUDGMENT

2       Plaintiffs move for relief from judgment pursuant to Federal Rule of Civil Procedure

3   60(b), seeking to amend the Court's findings of fact and conclusions of law ("FFCL"), and to file

4   an amended complaint that addresses policy changes made after trial and seeks damages for the

5   full period of Plaintiffs' exclusion from the VA facility.

6       Plaintiffs assert that the FFCL, which were prepared by Defendants at the Court's

7   direction and adopted in large part by the Court, are inconsistent with the Court's Memorandum

8   of Intended Decision, the record, and the law of the case.  Plaintiffs' motion is governed by

9   Federal Rule of Civil Procedure 52(b), which provides in relevant part as follows:

10          On a party's motion filed no later than 10 days after the entry of judgment, the
            court may amend its findings – or make additional findings – and may amend the
11          judgment accordingly.

12   Fed. R. Civ. P. 52(b).  Plaintiffs' motion was not filed within the ten-day period, and in fact was

13   not filed until one year after the Court issued its FFCL.  Accordingly, Plaintiffs' motion is

14   untimely.

15       Plaintiffs explain their failure to comply with Rule 52(b) by pointing to the circumstances

16   surrounding the issuance of the FFCL in April 2008:  there was some confusion as to the impact

17   of the notice of appeal filed by Plaintiffs in March 2008, prior to the issuance of the FFCL and

18   judgment; the FFCL contained a significant typographical error[3]; a presidential election was

19   imminent; and the parties were in the process of filing a number of post-judgment motions.

20   Plaintiffs argue that given these circumstances the Court should not strictly apply the ten-day

21   deadline set forth in Rule 52(b), but instead should apply the more lenient limitations period set

22   forth in Rule 60(b).  Under the latter rule, a party may seek relief from a final judgment, order, or

23   proceeding within a "reasonable" time; if the motion is brought on certain specified grounds,

24   "reasonable" time is defined as no more than one year after the final judgment, order, or

25   proceeding.  Fed. R. Civ. P. 60(c).

26       Even assuming that it may consider Plaintiffs' motion to amend the FFCL under Rule

27

28
---
[3] That error was amended on June 11, 2008 with the approval of the appellate court.

Case No. C 04-2012 JF (HRL)
ORDER RE PLAINTIFFS' MOTION FOR RELIEF FROM JUDGMENT, ATTORNEYS' FEES, AND SANCTIONS
(JFLC2)

1    60(b) at this time,[4] the Court concludes that Plaintiffs have failed to demonstrate a basis for their

2    proposed changes to the judgment.  Plaintiffs appear to be asserting that Defendants put material

3    in the FFCL that the Court did not intend to adopt.  However, the Court carefully considered its

4    Memorandum of Intended Decision, the record, and the applicable law before issuing the FFCL.

5    With the exception of the typographical error noted earlier, the FFCL said what the Court

6    intended them to say.  Accordingly, Plaintiffs' motion to amend the FFCL will be denied.

7           With respect to Plaintiffs' motion for leave to reopen the case and file an amended

8    complaint, it is not at all clear that the Court has authority to grant the requested relief given that

9    the judgment has been affirmed on appeal and the Court of Appeals did not remand the matter to

10   this Court for further proceedings.  Even if it does have such authority, the Court in its discretion

11   would not permit the proposed amendment.  Plaintiffs seek to litigate policies instituted *after* the

12   events giving rise to the instant litigation.  Given the complex procedural history of this case, the

13   Court believes that it would be much more appropriate for Plaintiffs to litigate such policies in a

14   new lawsuit.  The Court is mindful of Plaintiffs' financial circumstances, and it certainly does

15   not wish to impose any unnecessary burden upon Plaintiffs by requiring them to pay a new filing

16   fee or the other costs associated with commencing a new lawsuit.  However, the Court concludes

17   that tacking the new claims on to *this* case would cause needless procedural confusion.  Plaintiffs

18   assert that at the least they should be permitted to amend the operative complaint to litigate their

19   damages claim arising out of the events that predated the filing of the instant lawsuit.  However,

20   it does not appear that Plaintiffs would be entitled to any damages, because Plaintiffs failed to

21   prove at trial that Defendants are liable with respect to any of their claims.  Accordingly,

22   Plaintiffs' motion for leave to reopen this case and amend the complaint will be denied, without

23   prejudice to any future litigation asserting claims not adjudicated herein.

24                            **II. ATTORNEYS' FEES**

25   **A.    EAJA**

26           "In the United States, parties are ordinarily required to bear their own attorney's fees – the

27

28   _____

           [4] Rule 52(b) applies expressly to amendment of FFCL.

Case No. C 04-2012 JF (HRL)
ORDER RE PLAINTIFFS' MOTION FOR RELIEF FROM JUDGMENT, ATTORNEYS' FEES, AND SANCTIONS
(JFLC2)

1  prevailing party is not entitled to collect from the loser." *Buckhannon Bd. and Care Home, Inc.*

2  *v. West Virginia Dep't of Health and Human Resources*, 532 U.S. 598, 602 (2001). "Under this

3  American Rule, we follow a general practice of not awarding fees to a prevailing party absent

4  explicit statutory authority." *Id*. (internal quotation marks and citation omitted). "Congress,

5  however, has authorized the award of attorney's fees to the 'prevailing party' in numerous

6  statutes." *Id*.

7       Plaintiffs seek attorneys' fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C.

8  § 2412. That statute provides that in lawsuits brought by or against the United States, "[e]xcept

9  as otherwise specifically provided by statute, a court shall award to a prevailing party other than

10  the United States fees and other expenses . . . unless the court finds that the position of the

11  United States was substantially justified or that special circumstances make an award unjust." 28

12  U.S.C. § 2412(d)(1)(A). Plaintiffs appear to be ineligible for attorneys' fees under the EAJA

13  because they are not "prevailing" parties. Plaintiffs did not prevail on their motion for

14  preliminary injunction, at trial, or on either of their appeals.

15       Plaintiffs nonetheless assert that they are prevailing parties under the so-called "catalyst"

16  theory. That theory "allows an award where there is no judicially sanctioned change in the legal

17  relationship of the parties." *Buckhannon*, 532 U.S. at 605. A plaintiff may be considered a

18  prevailing party under the "catalyst" theory if (1) the goal of the lawsuit was realized (2) as a

19  result of the litigation. *Assoc. of Cal. Water Agencies v. Evans*, 386 F.3d 879, 885-86 (9th Cir.

20  2004). The plaintiff needs to receive only some of the benefits sought in the lawsuit. *Id*. at 886.

21  However, the benefits achieved must be required by law and not a gratuitous act of the defendant.

22  *Id*. at 886 n.3.

23       The Supreme Court has held that the "catalyst" theory is not a permissible basis for an

24  award of attorneys' fees under the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et*

25  *seq*., or the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq*.:

26       Numerous federal statutes allow courts to award attorney's fees and costs to the
         "prevailing party." The question presented here is whether this term includes a
27       party that has failed to secure a judgment on the merits or a court-ordered consent
         decree, but has nonetheless achieved the desired result because the lawsuit
28       brought about a voluntary change in the defendant's conduct. We hold that it does

4

1   not.

2   *Buckhannon*, 532 U.S. at 600.  The Ninth Circuit has applied *Buckhannon* expressly to the

3   EAJA.  *Perez-Arellano v. Smith*, 279 F.3d 791, 794 (9th Cir. 2002).  *Perez-Arellano* holds that "a

4   prevailing party under the EAJA must be one who has gained by judgment or consent decree a

5   material alteration of the legal relationship of the parties."  *Id*.  The Ninth Circuit later expanded

6   its holding to include parties who have obtained a material alteration of the legal relationship by

7   means of a court order incorporating a voluntary stipulation of the parties.  *Carbonnel v. INS*, 429

8   F.3d 894, 900-01 (9th Cir. 2005).  In *Carbonnel*, the court reviewed cases in which it had

9   recognized as prevailing parties litigants who obtained preliminary injunctions and who entered

10  into legally enforceable settlement agreements.  *Id*. at 899.  The court held that the relevant

11  question is whether the material alteration of the legal relationship of the parties has sufficient

12  "judicial imprimatur."  *Id*. at 899-900.  More recently, the court has clarified that the "judicial

13  imprimatur" must relate to a form of judicial *relief* – without more, a favorable determination of

14  a legal issue is insufficient to support a fee award under the EAJA, even if such determination

15  puts the plaintiff "well down the road to victory."  *Citizens For Better Forestry v. U.S. Dep't of

16  Agriculture.*, 567 F.3d 1128, 1134 (9th Cir. 2009).  In other words, a plaintiff is not entitled to

17  attorneys' fees under the EAJA unless he or she obtains "[r]elief from the court in some formal

18  fashion."  *Id*.

19       Plaintiffs cannot meet this requirement.  They have not established that they achieved a

20  benefit resulting from a material alteration of their relationship with Defendants, or that any such

21  benefit has sufficient judicial imprimatur to permit them to characterize themselves as prevailing

22  parties.  Plaintiffs suggest that the Court's Tentative Ruling issued August 19, 2004, shortly after

23  the commencement of the litigation, satisfies these requirements.  However, the Court vacated

24  the Tentative Ruling approximately five weeks after it issued, and it ultimately denied Plaintiffs'

25  motion for preliminary injunction.  Given the subsequent history of this case, the Tentative

26  Ruling does not provide a basis for an award of attorneys' fees.

27  **B.   Stipulation**

28       Plaintiffs also claim that Defendants agreed to pay Plaintiffs' attorneys' fees in return for

5

1   Plaintiffs' elimination of their claim for nominal damages.  Plaintiffs cite excerpts of hearing

2   transcripts documenting discussions between the Court and Mr. Martikan.  However, those

3   excerpts do not evidence a stipulation to pay fees.  The Court stated its understanding that

4   Plaintiffs would be entitled to fees if they prevailed on their equitable claims for relief, or if the

5   Government changed its policies as a result of the lawsuit.  Mr. Martikan agreed with the Court's

6   characterization of the law.  These colloquies occurred before trial was held, at a time when the

7   Court had neither requested nor received briefing with respect to current case law governing

8   attorneys' fees.  As discussed above, the "catalyst" theory is inapplicable to claims brought under

9   the EAJA.

10       Even if the conversations cited by Plaintiffs somehow were deemed to supersede the

11   limitations imposed by case law, Plaintiffs did *not* prevail on their equitable claims, nor did they

12   achieve the primary goal of their litigation, which was access to the VA facilities to register

13   voters.  Accordingly, Plaintiffs' application for attorneys' fees based upon a stipulation of the

14   parties likewise must be denied.

15   **C.    Sanctions**

16       Finally, Plaintiffs request that the Court award attorneys' fees as a sanction for the

17   conduct of defense counsel Owen Martikan during the instant litigation.  For the reasons

18   discussed below, the Court concludes that sanctions are not warranted.

19                              **III. SANCTIONS**

20       Plaintiffs have filed two formal motions for sanctions in this case. The first such motion,

21   filed November 28, 2005 [docket no. 80], seeks sanctions pursuant to 28 U.S.C. § 1927 and the

22   Court's inherent powers.  Specifically, Plaintiffs assert that Defendants' counsel, Owen Martikan,

23   acted in bad faith when he falsely represented to the Court that Plaintiffs' counsel, Scott Rafferty,

24   (1) photographed a schizophrenic patient at Building 331 on August 13, 2004, and (2) committed

25   felonies by assisting VA residents to mark their absentee ballots on March 2, 2004, the date of

26   California's statewide primary election.  The second motion, filed March 8, 2007 [docket no.

27   134], seeks sanctions pursuant to Federal Rule of Civil Procedure 11.  That motion focuses only

28   upon Mr. Martikan's representation that Mr. Rafferty photographed a schizophrenic patient at

6

1   Building 331.

2          The representations at issue appear in docket no. 34, Defendants' Response To The

3   Court's Second Request For Supplemental Briefing.  That document, which was prepared by Mr.

4   Martikan, states expressly that on August 13, 2004, Mr. Rafferty "photographed patients without

5   permission, severely upsetting one paranoid schizophrenic resident for the rest of the day."  Doc.

6   No. 34 at 1.  Docket no. 34 also includes the declaration of Ms. Polentz, who states that Mr.

7   Rafferty entered Building 331 on March 2, 2004 (the date of the statewide primary election), in

8   order to assist residents to fill out their absentee ballots and/or register them to vote.  Polentz

9   Decl. ¶ 3.  Mr. Rafferty claims that Mr. Martikan had no reasonable basis to believe that Mr.

10  Rafferty had photographed a schizophrenic patient in August 2004 or entered Building 331 on

11  Election Day in March 2004, and that Mr. Martikan failed to conduct an adequate inquiry before

12  making such representations to the Court.

13         On May 8, 2009, the Court issued an Order Re Scope Of Hearing, stating that both of

14  Plaintiffs' sanctions motions would be addressed at the hearing on May 26, 2009.  However, in

15  reviewing the record in preparation for the hearing, the Court concluded that in fact it previously

16  had disposed of the motion brought pursuant to § 1927 and the Court's inherent powers.  Indeed,

17  the record shows that the Court conditionally denied that motion in its order dated January 13,

18  2006 based upon Mr. Martikan's promise to resubmit certain declarations under penalty of

19  perjury.  Mr. Martikan did so.  Consequently, at the start of the evidentiary hearing, the Court

20  clarified that only the Rule 11 motion was appropriate for adjudication.  At the same time, the

21  Court understood that the parties had tailored their presentations based upon the Court's

22  indication that Plaintiffs could pursue sanctions based upon Ms. Polentz's declaration.

23  Accordingly, the Court advised the parties that it would exercise its inherent powers on its own

24  motion if the evidence demonstrated bad faith on the part of Mr. Martikan with respect to either

25  the representation regarding the photograph or the representation regarding Mr. Rafferty's

26  Election Day conduct.

27         The Court also ruled orally that Plaintiffs' motion for Rule 11 sanctions was timely, as

28  Plaintiffs had attempted to raise the issue of sanctions throughout the lawsuit, and the Court

7

1    deferred consideration of Plaintiffs' request for sanctions on several occasions.  Accordingly,

2    Plaintiffs have satisfied the district's Civil Local Rules requiring that a motion for sanctions be

3    brought "as soon as practicable after the filing party learns of the circumstances" upon which the

4    motion is based.  Civ. L.R. 7-8(c).

5    **A.    Legal Standards**

6           Rule 11 requires that "[e]very pleading, written motion, and other paper shall be signed

7    by at least one attorney of record in the attorney's individual name. . . ."  Fed. R. Civ. P. 11(a).

8    The Rule provides that by presenting a pleading or written motion to the Court, an attorney is

9    certifying that the motion is not being presented for "any improper purpose, such as to harass or

10   to cause unnecessary delay or needless increase in the cost of litigation" and that the "allegations

11   and other factual contentions have evidentiary support."  Fed. R. Civ. P. 11(b)(1) and (3).  The

12   Rule authorizes the imposition of sanctions against individuals who fail to comply with these

13   requirements, that is, who file documents for an improper purpose or present filings that are

14   frivolous, legally unreasonable, or without factual foundation.  *Estate of Blue v. County of Los*

15   *Angeles*, 120 F.3d 982, 985 (9th Cir. 1997).  Frivolous filings are "those that are both baseless

16   and made without a reasonable and competent inquiry."  *Id*.  (internal citations omitted).  The

17   rule imposes an affirmative duty on a party or counsel to investigate the law and facts before

18   filing.  *Rachel v. Banana Republic, Inc.,* 831 F.2d 1503, 1508 (9th Cir.1987).  Whether Rule 11

19   has been violated is measured by an objective standard.  *Zaldivar v. City of Los Angeles*, 780

20   F.2d 823, 831 (9th Cir. 1986).

21          In contrast, a Court may impose sanctions against an attorney under its inherent powers

22   only after finding that the attorney acted in bad faith.  *United Steel v. Shell Oil Co.*, 549 F.3d

23   1204, 1209 (9th Cir. 2008).

24   **B.    Testimony**

25          The Court heard testimony from seven live witnesses, which may be summarized as

26   follows:

27          **1.    Tracy Marino**

28          Tracy Marino was a recreation therapy assistant at Building 331 during the events in

8

question. She testified as follows: on August 13, 2004, she witnessed an incident involving Mr. Rafferty and her co-worker, Shawna Hill. Ms. Marino was in the occupational therapy clinic at Building 331 when she heard Ms. Hill – who was not in her line of sight – speak in a loud, "alarmed tone" while asking someone to leave the building. Ms. Marino walked out of the occupational therapy clinic and observed Mr. Rafferty and Ms. Hill in the hallway leading to the lobby area of Building 331. Ms. Marino then heard Ms. Hill ask Mr. Rafferty to stop taking pictures, and to leave the building. Mr. Rafferty stated, "I don't have to." It appeared to Ms. Marino that the two were arguing. In response to Ms. Hill's request that he stop taking pictures, Mr. Rafferty replied, "fine, I will take your picture then." Mr. Rafferty proceeded to photograph Ms. Hill despite the fact that she protested by turning her head and blocking her face.

At that point, Ms. Marino approached and asked Mr. Rafferty to leave. Mr. Rafferty responded by stating that he did not have to leave, and asking Ms. Marino's identity. Ms. Marino stated her name and again asked Mr. Rafferty to leave. Ms. Marino testified that Mr. Rafferty was argumentative and aggressive, and that she felt "a little scared and intimidated." Ms. Marino called the VA police from a telephone on the wall of the lobby. Mr. Rafferty left the building shortly before the VA police arrived; the police stopped Mr. Rafferty as he was driving away from the area.

There were four patients close by during Ms. Marino's interaction with Mr. Rafferty, perhaps within twenty feet. The patients appeared to be very concerned and each one independently checked in with Ms. Marino and Ms. Hill after the incident to make sure Ms. Marino and Ms. Hill were okay. Two of the patients who observed the incident suffered from schizophrenia; one of those patients was concerned and "sort of off the wall" about the incident afterward.

At the request of the police, Ms. Marino prepared a witness statement documenting the incident. She downloaded the form from a governmental website. No one was with her when she prepared her statement. She did not speak to Mr. Martikan before preparing the statement, and no one coached her in any way in the preparation of the statement. Ms. Marino gave the statement to Karen Girton, the facility's nurse manager, for delivery to the police. Ms. Marino

9

1   also subsequently discussed the incident at a staff meeting that was attended by Dr. Monique

2   Yohanan, among others.  Ms. Marino testified that in her almost twenty years working for the

3   VA, this was the most upsetting incident she had witnessed involving a member of the public.

4   **2.   Shawna Hill**

5   Shawna Hill was a recreation therapy assistant at Building 331 at the time of the incident

6   and had worked there for five years.  She testified as follows: on August 13, 2004, she observed

7   Mr. Rafferty in a hallway of Building 331, walking toward one of the facility's residence units;

8   she smiled or nodded, greeting him in some way, but Mr Rafferty did not respond or react at all,

9   which she found to be unusual.  Mr. Rafferty appeared "disheveled."  Ms. Hill later saw Mr.

10   Rafferty walking from the direction of the residence unit toward the lobby, taking photographs

11   along the hallway.  Ms. Hill was concerned because there were pictures of patients on the

12   hallway walls.  She asked, "may I help you?," but Mr. Rafferty said no.  Ms. Hill informed Mr.

13   Rafferty that he was not permitted to take pictures inside the building because of privacy

14   considerations.  At that point, Mr. Rafferty became argumentative and stated that he had a right

15   to be in the building and to take pictures.  His tone of voice was aggressive and abrupt.  Mr.

16   Rafferty continued taking pictures, photographing the lobby area.  Ms. Hill felt uncomfortable

17   that Mr. Rafferty had not identified himself and had continued to take pictures when asked to

18   stop.  She informed him that if he did not leave she would call the VA police.  Mr. Rafferty asked

19   for her name, but she felt uncomfortable identifying herself to him, and stated only that she was a

20   staff member.  Mr. Rafferty responded by stating, "if you aren't going to give me your name,

21   then I will go ahead and take a picture of you myself."  Mr. Rafferty attempted to photograph Ms.

22   Hill's face and name tag.  Ms. Hill observed that the patients nearby appeared to be

23   uncomfortable and to be getting anxious.

24   Ms. Hill did not know for certain whether Mr. Rafferty had photographed any of the

25   patients, but believed that it was possible because he was "snapping, some aiming, and then some

26   just holding the camera out."  She formed the impression that he was photographing patients or

27   that patients might appear in the frames of the photographs he was taking.  At some point, Ms.

28   Marino arrived on the scene.  Ms. Hill thought that Ms. Marino may have called the police, but

10

1  she did not know for certain.  When Ms. Hill told Mr. Rafferty that *she* was going to call the

2  police, Mr. Rafferty left the building and got into his car, where the VA police ultimately

3  approached him.  Mr. Rafferty never did identify himself to Ms. Hill.

4       After Mr. Rafferty left, Ms. Hill discussed the incident with Ms. Marino, reported it to

5  staff, and checked in with two patients who had appeared uncomfortable during the incident.

6  One of the patients was schizophrenic.  Ms. Hill also prepared a written statement at the request

7  of the police.  She did not include all the details presented in her testimony because she was

8  trying to keep her written statement succinct.  She did not speak with any lawyer before

9  preparing her statement and was not coached in any way as to the contents of the statement.  Ms.

10  Hill brought up the incident at a treatment team meeting at which Dr. Yohanan was present.  Ms.

11  Hill also brought up the incident with Dr. Yohanan individually either the day of the incident or

12  shortly thereafter.  In Ms. Hill's five years of experience working at Building 331, this was the

13  most significant incident she could remember.

14       **3.    J. Jackman**

15       Dr. J. Jackman, a forensic psychiatrist retained by Plaintiffs, testified that in 2007 he

16  examined the records of two different residents of Building 331 who suffered from mental illness

17  with paranoid traits.  He testified that there was no notation in either file reflecting a disturbance

18  on August 13, 2004.  He opined that it would be below the clinical standard of care to fail to note

19  such a disturbance.

20       Dr. Jackman also testified that a patient with a diagnosis of paranoid schizophrenia could

21  claim to be spied upon and could become upset if photographs were taken in his vicinity, whether

22  or not he actually was photographed.  Such a patient also could feel spied upon and upset if he

23  heard that pictures had been taken inside his residential facility, whether or not he was present at

24  the time the pictures were taken.

25       **4.    Monique Yohanan**

26       Dr. Monique Yohanan was the physician of record at Building 331 at the time in

27  question.  She is trained in internal medicine and geriatric medicine, has worked extensively with

28  psychiatrists, and has published in the *American Journal of Psychiatry*.  She testified as follows:

11

1   the incident with Mr. Rafferty occurred while she was on vacation[5]; she was informed of it at a

2   team meeting held after she returned, which was sometime after August 23, 2004.  Dr. Yohanan

3   believes that she also may have discussed the incident informally with staff at Building 331.  Dr.

4   Yohanan was informed that one patient in particular was quite disturbed, but she did not place a

5   note in that patient's chart because the incident with Mr. Rafferty had occurred weeks prior when

6   she was not present, and the patient appeared to be stable.  Dr. Yohanan did not raise the incident

7   with the patient initially because she did not want to upset him; the patient previously had

8   refused dialysis and other medical treatment when upset.  Dr. Yohanan subsequently did discuss

9   the incident with the patient, but only briefly.

10          Dr. Yohanan prepared a declaration on September 3, 2004, at which time she mistakenly

11   believed that the patient in question had a diagnosis of paranoid schizophrenia, when in fact that

12   particular patient had schizoaffective disorder with paranoia.  No one coached Dr. Yohanan as to

13   the contents of her declaration, except for the last two sentences attesting to the truthfulness of

14   her declaration; those sentences were suggested by Mr. Martikan or another lawyer.  Before

15   preparing her declaration, Dr. Yohanan informed Mr. Martikan that she was not present when the

16   incident with Mr. Rafferty occurred, and thus had no firsthand knowledge, but that she could

17   report what staff members had reported to her.  Dr. Yohanan told Mr. Martikan that the staff

18   members of Building 331 were dedicated and that she believed their version of events.  Mr.

19   Martikan indicated that as long as Dr. Yohanan made clear that she had no firsthand knowledge

20   of the incident, she could report what she was told by staff.  Dr. Yohanan stated in her

21   declaration that a staff member had reported that Mr. Rafferty had photographed a mentally ill

22   patient, and that she still believed that to be the case.  Dr. Yohanan suggested that Mr. Martikan

23   should speak with the recreational therapists who were present at the time of the incident.

24          **5.       Sausha Polentz**

25          Sausha Polentz was a recreation therapy assistant at Building 331 at the time in question.

26

27          [5] Technically, Dr. Yohanan did not leave for vacation until August 16th, the Monday

28   following the Friday incident involving Mr. Rafferty.  However, she did not work at Building
     331 on August 13th, and did not hear about the incident until she returned from her vacation.

Case No. C 04-2012 JF (HRL)
ORDER RE PLAINTIFFS' MOTION FOR RELIEF FROM JUDGMENT, ATTORNEYS' FEES, AND SANCTIONS
(JFLC2)

1  She testified as follows:  she first encountered Mr. Rafferty when he entered Building 331 on or

2  about March 2, 2004, the date of the statewide primary election, stating that he wished to register

3  voters and/or assist residents in filling out their absentee ballots.  Mr. Rafferty also stated that he

4  was with the Democratic party.  This initial contact could have been in late February rather than

5  on Election Day itself.  Ms. Polentz told Mr. Rafferty that he could not enter Building 331 for

6  such a purpose, and he became very upset.  He became aggressive, raised his voice, and invaded

7  Ms. Polentz's personal space to a degree that she felt threatened.

8        Ms. Polentz had a second encounter with Mr. Rafferty on or about April 5, 2004 when she

9  returned to Building 331 seeking to learn Ms. Polentz's identity.  He again acted aggressively,

10  stepping very close to her, and his mannerisms were "shaky" and "jarring."  During this

11  encounter, he denied being affiliated with a political party.  She subsequently observed Mr.

12  Rafferty when he returned to the building for a third time in an effort to register voters.

13        On April 6, 2004, Ms. Polentz prepared a "contact form" documenting her interactions

14  with Mr. Rafferty.  On September 7, 2004, she prepared a declaration regarding the events in

15  question.  She submitted the declaration to Mr. Martikan, who subsequently contacted her to ask

16  whether she was sure about the March 2, 2004 date of the first contact.  She told him that she was

17  sure that March 2 was the right time frame.  She was not aware until recently that it is a crime to

18  register voters within fifteen days of an election, and it likewise is a crime to assist a non-relative

19  to complete an absentee ballot.

20        Ms. Polentz testified that she prepared the declaration herself, without coaching from

21  anyone.  She could not explain how she came to include certain technical legal language, such as

22  "I declare under penalty of perjury under the laws of the State of California in the United States

23  that the foregoing is true and correct."  She is married to an attorney; she may have gotten the

24  language from him.

25  **6.    Owen Martikan**

26        Mr. Martikan acknowledged that Mr. Preminger complied with the safe harbor provision

27  of Rule 11 by granting him three months to withdraw docket no. 34, the document containing the

28  statements that form the basis for the sanctions motion.  Mr. Martikan did not believe that

1    withdrawal of docket no. 34 was necessary or warranted.

2        Mr. Martikan testified that although he had not intended to speak to or obtain declarations

3    from any residents of Building 331, one resident, Gordon Schmeltzer, insisted upon filing a

4    declaration in this action.  Mr. Schmeltzer stated that he wanted to do so because he felt that Mr.

5    Rafferty had threatened Ms. Marino and Ms. Hill.  After speaking with Mr. Schmeltzer, Mr.

6    Martikan was satisfied that Mr. Schmeltzer was mentally acute, and agreed to let him provide a

7    declaration.  Mr. Martikan met with Mr. Schmeltzer at Building 331, at which time Mr.

8    Schmeltzer dictated his declaration.  Mr. Martikan or another lawyer assigned to the case typed

9    the declaration, and Mr. Schmeltzer read and signed it.  Mr. Martikan did not ask Mr. Schmeltzer

10   whether he had any prior interactions with Mr. Rafferty.[6]  Mr. Martikan stated that he took Mr.

11   Schmeltzer's proffered reasons for his involvement at face value.

12       With respect to the declaration of Ms. Polentz, Mr. Martikan stated that accusing Mr.

13   Rafferty of violating election laws was the farthest thing from his mind when he submitted the

14   declaration as part of docket no. 34.  After Mr. Rafferty took the position that Mr. Martikan had

15   accused him of violating election laws, Mr. Martikan was not convinced that Ms. Polentz's

16   declaration was specific enough to establish a violation.  However, Mr. Martikan did contact Ms.

17   Polentz and ask whether she was certain of the March 2 date, and she said that she was.

18       At this point in Mr. Martikan's testimony, the Court inquired whether Mr. Martikan had

19   attempted to discuss with Mr. Rafferty ways in which Mr. Rafferty's version of events could be

20   verified.  Mr. Martikan stated that Mr. Rafferty was irate, yelled, and hung up on Mr. Martikan

21   during their telephone conversation about Ms. Polentz's declaration.  Based upon that conduct

22   and prior difficult conversations with Mr. Rafferty, Mr. Martikan chose not to pursue the

23   discussion.  Mr. Martikan did not send Mr. Rafferty a written inquiry as to his whereabouts on

24   and around March 2, 2004.

25       With respect to Mr. Martikan's representation that Mr. Rafferty photographed a

26   schizophrenic patient, Mr. Martikan testified that he first was told about that alleged conduct on a

27

28   _____
     [6] According to Mr. Rafferty, Mr. Schmeltzer in fact had a personal animus toward Mr.
     Rafferty.

14

1    Friday, and his brief – the brief ultimately filed as docket no. 34 – was due the following

2    Monday.  He spent that Friday attempting to speak to everyone who was available and had any

3    knowledge of the August 13, 2004 incident involving Mr. Rafferty.  Mr. Martikan spoke with Dr.

4    Yohanan, Ms. Girton, Dwight Wilson, Mr. Schmeltzer, and Catherine Holden.  Ms. Marino and

5    Ms. Hill were not available that day, but he had their witness statements.  He felt that the

6    descriptions of Mr. Rafferty's behavior obtained in this investigation were sufficient

7    corroboration of Dr. Yohanan's statement that Mr. Rafferty had photographed a schizophrenic

8    patient.

9         After Mr. Rafferty denied that he had photographed a schizophrenic patient, Mr. Martikan

10   had further conversations with all the relevant witnesses on a number of occasions.  All of them,

11   including Dr. Yohanan, stood by their written statements and declarations.  Dr. Yohanan stated

12   that she was certain that a staff member had told her that Mr. Rafferty had photographed a

13   patient, but that she could not remember which staff member had done so.  Mr. Martikan did not

14   feel that it was appropriate to approach the patient in question directly.

15        **7.    Scott Rafferty**

16        Because he was both counsel for Plaintiffs and a percipient witness, Mr. Rafferty was

17   permitted to testify in narrative form.  He stated that his first visit to Building 331 was on

18   February 3, 2004, at which time he encountered Ms. Polentz.  He denied being argumentative or

19   hostile, but acknowledged that he did "press" Ms. Polentz to explain why he was not permitted to

20   register voters in the building.

21        Mr. Rafferty was in San Francisco on March 2, 2004 (Election Day).  He testified that he

22   returned to Building 331 on March 3.  However, he subsequently testified that he was *not* at

23   Building 331 on March 3; he could not state exactly when he returned to the building, but was

24   certain that his original testimony that he was present on March 3 was in error, and that he did

25   not return to Building 331 until substantially after the March 2 election.

26        When discussing the issue with Mr. Martikan following the filing of docket no. 34, Mr.

27   Rafferty told Mr. Martikan that he was not at Building 331 on Election Day.  However, Mr.

28   Rafferty did not offer Mr. Martikan contact information for witnesses who could substantiate that

1  Mr. Rafferty had been in San Francisco.

2        With respect to the incident on August 13, Mr. Rafferty admitted that he was taking

3  photographs in Building 331, but he stated that he took a total of six pictures, none of which

4  shows a patient.  He denied that he acted in an argumentative or hostile manner toward VA staff,

5  and stated that in fact he acted professionally in all of his dealings with them.

6        Mr. Rafferty testified that when he objected to Mr. Martikan's reliance on Dr. Yohanan's

7  declaration because Dr. Yohanan was not present, Mr. Martikan represented that the declaration

8  was admissible because it was based upon medical records.  Mr. Rafferty also testified that he

9  was even-tempered in his dealings with Mr. Martikan, and stated specifically that he did not yell

10  at Mr. Martikan or hang up on him when discussing the sanctions issue.  Mr. Rafferty speculated

11  that Mr. Martikan could have had a mistaken impression because Mr. Rafferty was speaking on a

12  cellular phone and thus may have been speaking more loudly than normal.  Mr. Rafferty also

13  speculated that the call that Mr. Martikan believed was terminated by Mr. Rafferty in fact was

14  dropped as a result of a bad connection.

15  **C.    Analysis**

16        The Court has taken the instant motion for sanctions quite seriously.  It has conducted an

17  exhaustive review of the record in this case, devoted an entire day to hearing live testimony, and

18  reviewed carefully the lengthy transcript from the hearing.  The picture that has emerged is that

19  of a dedicated and ethical Plaintiffs' attorney who believes sincerely that his professional

20  reputation has been harmed, and the rights of his clients impaired, by willful misconduct or at

21  best inexcusable sloppiness on the part of Defendants' counsel.  On the other side of the dispute

22  is an equally dedicated and ethical attorney who believes sincerely in the positions he has taken

23  during this litigation.  These observations are not dispositive, or even relevant to a Rule 11

24  analysis, which requires application of an objective standard.  However, the Court's favorable

25  opinion as to the character and intent of both counsel in this matter has made the instant

26  proceedings particularly difficult.  The Court is well aware that the proceedings have been even

27  more difficult for counsel.

28        Based upon this record, the Court concludes that docket no. 34 was not filed in bad faith.

16

1  Accordingly, the Court may not impose sanctions under its inherent powers.  The Court likewise

2  concludes that docket no. 34 was not filed for "any improper purpose, such as to harass or to

3  cause unnecessary delay or needless increase in the cost of litigation."  *See* Fed. R. Civ. P.

4  11(b)(1).  The disposition of Plaintiffs' motion thus turns on whether there was sufficient

5  evidentiary support for Mr. Martikan's factual contentions regarding Mr. Rafferty's

6  photographing of a schizophrenic patient on August 13, 2004 and presence at Building 331 on

7  March 2, 2004.  *See* Fed. R. Civ. P. 11(b)(3).  A factual contention gives rise to sanctions under

8  Rule 11 when it is without foundation or is frivolous, that is, "both baseless and made without a

9  reasonable and competent inquiry."  *Estate of Blue*, 120 F.3d at 985.

10        The Court concludes that neither of the representations at issue was baseless or made

11  without a reasonable inquiry.  It is clear from the record, and the Court expressly finds as a fact,

12  that Mr. Rafferty did not deliberately photograph a schizophrenic resident of Building 331.  It is

13  abundantly clear from the evidence that such an act would have been abhorrent to Mr. Rafferty

14  and inconsistent with his efforts to promote the civil rights and dignity of residents of Building

15  331.  However, Mr. Martikan's investigation was neither unreasonable nor incompetent.  Dr.

16  Yohanan stated in her declaration that upon her return from vacation she was informed by a staff

17  member that Mr. Rafferty in fact had photographed a particular schizophrenic patient, and that

18  the patient had become upset.  Dr. Yohanan could not identify the source of this statement for

19  Mr. Martikan, but she obviously believed in good faith that the incident had occurred.  The

20  statements of all the percipient witnesses, particularly as to Mr. Rafferty's demeanor and attitude

21  toward VA staff, were consistent with Dr. Yohanan's assertion.  It is undisputed that Mr.

22  Rafferty did in fact have a camera with him at Building 331 on the day in question and did take

23  photographs within the facility.  All of the witnesses except for Mr. Rafferty himself agree that

24  Mr. Rafferty acted in an aggressive, intimidating manner, and insisted on his right to be present

25  in the building while at the same time refusing to identify himself.  Ms. Marino and Ms. Hill both

26  testified that Mr. Rafferty photographed Ms. Hill against her will.  Those photographs were not

27  produced by Mr. Rafferty, raising a factual issue as to whether the photographs that Mr. Rafferty

28  did produce represent all of the photographs he took at the facility.  While Mr. Rafferty testified

17

1   that he behaved professionally throughout the August 13, 2004 incident, the fact that every other

2   person involved in the incident saw him in a completely different light raises at least some

3   questions regarding the accuracy of Mr. Rafferty's self-perception.  There is no evidence that Mr.

4   Martikan coached any of the witnesses.

5       With respect to the representation contained in Ms. Polentz's declaration regarding

6   Election Day misconduct, the record reflects that Ms. Polentz was very definite in her conviction

7   that Mr. Rafferty was present at Building 331 on or about March 2, 2004.  When Mr. Rafferty

8   objected to this statement, Mr. Martikan contacted Ms. Polentz and confirmed that she was

9   confident in the accuracy of her statement.  Mr. Rafferty himself first testified that he was present

10  in Building 331 on March 3, the day after the election.  Later in his testimony, Mr. Rafferty stated

11  that he did not return to Building 331 until significantly after the election.

12      Mr. Rafferty testified that he was in San Francisco on March 2.  He acknowledges,

13  however, that he did not provide Mr. Martikan with contact information for individuals who

14  could vouch for his presence there.  Mr. Martikan testified credibly that he did not pursue a

15  conversation regarding Mr. Rafferty's whereabouts on March 2 because Mr. Rafferty yelled at

16  him and hung up on him.  Mr. Rafferty denies that he did either, speculating that he was speaking

17  in a loud tone because of bad cellular reception and that his cellular phone dropped the call.

18  However, even accepting Mr. Rafferty's explanation, Mr. Martikan's view of the conversation

19  was not beyond the bounds of reasonableness.

20      In hindsight, it is clear that both counsel could have done more to avoid the unfortunate

21  deterioration of their professional relationship.  In particular, both Mr. Rafferty and Mr. Martikan

22  could have made a greater effort to communicate civilly with each other.  However, for the

23  reasons discussed above, and based upon the record as a whole, the Court finds and concludes

24  that Mr. Martikan's conduct was not objectively unreasonable.  Accordingly, Plaintiffs' motion

25  for sanctions under Rule 11 will be denied.[7]

26

27          [7] It also bears mentioning that Mr. Rafferty's concurrent status as attorney for one of the

28  parties and an active participant in and percipient witness to critical disputed events put Mr.
    Rafferty in a problematic position throughout the instant litigation.  While the Court has sincere

Case No. C 04-2012 JF (HRL)
ORDER RE PLAINTIFFS' MOTION FOR RELIEF FROM JUDGMENT, ATTORNEYS' FEES, AND SANCTIONS
(JFLC2)

1

**IV. ORDER**

2      Plaintiffs' motions for relief from judgment, attorneys' fees, and sanctions are DENIED.

3

4

5

6    DATED:  8/25/2009

7                                                        _____

8                                                        JEREMY FOGEL
                                                         United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26    _____

27    respect for Mr. Rafferty's dedication to the goals of his clients, such a dual role usually should be
      avoided.  *See Kalina v. Fletcher*, 522 U.S. 118, 130 (1997) ("tradition, as well as the ethics of

28    our profession, generally instruct counsel to avoid the risks associated with participating as both
      advocate and witness in the same proceeding").

                                                    19

1   Copies of Order served on:

2

3   James A. Scharf     james.scharf@usdoj.gov, mimi.lam@usdoj.gov

4   Owen Peter Martikan     owen.martikan@usdoj.gov, Marina.Ponomarchuk@usdoj.gov

5   Scott Joseph Rafferty     rafferty@alumni.princeton.edu

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20